(77 South. 123)

No. 21029.

GALLOT v. McCOY.

(Nov. 26, 1917.)

*(Syllabus by the Court.)*

1. SALES—VALIDITY OF CONTRACTS.

"Engagements made through error, violence, fraud or menace, are not absolutely null, but are voidable by the parties, who have contracted under the influence of such error, fraud, violence, or menace, or by the representatives of such parties." Civ. Code, art. 1881.

2. VENDOR AND PURCHASER &⟋43(1)—VOIDABLE SALE — RATIFICATION — LEASE — PAYMENT OF RENTS.

Such contracts may be ratified by the subsequent voluntary acts of the parties. But, in the case of a voidable sale, an alleged contract of lease must be a valid contract to have such effect. And the alleged payments of rent when the rent was shown to have been collected through force and fraud practiced by the alleged vendee do not have the effect of ratifying such voidable act of sale.

Appeal from Sixteenth Judicial District Court, Parish of St. Landry; B. H. Pavy, Judge.

Action by Hermina Gallot, widow, prosecuted after her death by her heirs, against Allen McCoy. Judgment for defendant dismissing the suit, and plaintiff appeals. Reversed, and judgment ordered in favor of plaintiffs against defendant, and case remanded for an accounting.

Peyton R. Sandoz and R. Lee Garland, both of Opelousas, for appellant. Gilbert L. Dupre and John W. Lewis, both of Opelousas, for appellee.

SOMMERVILLE, J. Hermina Gallot, widow of Isadore Frette, was the original plaintiff in this case. She died before the suit came to trial, her heirs have been made parties, and the suit was prosecuted to judgment in the district court. Plaintiff was an old, infirm, colored woman. She was unable to read and write. She owned the property described in the petition, and title to that property constitutes the subject-matter of this suit.

In the year 1906, the original plaintiff owed money to her merchant and others, which she was unable to pay. She sought the aid of defendant, who is a white man and was a neighbor, for the purpose of negotiating a loan, whereby she could raise money on her property wherewith to pay her debts. Defendant took the old woman to Opelousas, and had her to pass an act of sale of the property to him, the nominal consideration for which was placed at $1,200. The sum of $700 was said to have been paid cash, and the balance of the purchase price was represented by one note for $500, due and payable one year after date. This act of sale was executed on December 22, 1906. The $500 note was negotiated with J. T. Stewart, a money lender, and the old woman paid her then outstanding obligations. The sale at

that time was clearly intended to be a mortgage or security, and was apparently so regarded and considered by both parties to the act. The widow Gallot continued in possession of the property.

Plaintiff increased her indebtedness to Stewart, and after the lapse of two years a new note was given to represent the increased indebtedness. This new note was furnished by defendant selling back to the old woman the same property for an alleged consideration of $1,575. The sum of $845 was stated to be a cash payment, and the balance of the purchase price was represented by one promissory note for the sum of $730, payable one year after date. This sale was effected November 30, 1908.

This latter note appears to have been reduced, and the interest on it paid. James T. Stewart, the holder of the note, died in the year 1910, and when the note matured, December 30, 1910, the heirs of Stewart demanded payment and refused to carry the note any longer. Mrs. Gallot again consulted defendant, McCoy, about raising money to pay the Stewart heirs, and she was told by him that one Vincent W. Boagni would lend the money. McCoy took the widow Gallot to a notary public in Opelousas, and had her to reconvey to him the same piece of property for an alleged consideration of $1,500, of which $900 was stated in the act to have been paid in cash, and the balance of the purchase price was represented by a note for the sum of $600, payable one year after date. This latter sale was passed January 7, 1911. The $600 note was passed to V. W. Boagni, the money lender, and the money derived therefrom was used to pay the plaintiff's obligation to the Stewart heirs.

The plaintiff instituted suit to set aside this last sale, alleging that she never intended to sell the property to McCoy, but only to mortgage it in order to raise money. She alleged that she had not received any cash consideration whatever; that she had signed the act of sale through error, and on the false representations of McCoy; and, by reason of the fraud and deception practiced upon her by him, and believing all the while that she was executing a mortgage on her property, for the purpose of paying the aforesaid indebtedness to the Stewart heirs, she erroneously signed the act of sale; that the price was vile and inadequate; that she had received no portion of same in any manner whatever. She asked that the sale be declared null and void, and of no effect; that title to the property be restored to her, free and unincumbered with the exception of such rights, claims, or privileges thereon as were held by V. W. Boagni; that an injunction issue restraining defendant from interfering with petitioner's use, possession, or occupancy of the premises; and that she recover judgment in the sum of $145.60 from the defendant, for cotton, corn, etc., taken by him from her by force and fraud.

Defendant filed several exceptions which were overruled. On the trial of the plea in abatement, based upon an allegation that the death of plaintiff occurred before service of citation and copy of petition had been made, defendant appeared as a witness and testified that the service had been made on the day of the death of plaintiff, but after her decease. He admitted having told counsel for the plaintiff that the papers had not been served on him, and said that he had been joking in so stating. Defendant thus showed himself to be unworthy of belief as a witness at the very inception of this cause.

The heirs of plaintiff made themselves parties, and defendant answered and admitted that the alleged consideration of $1,500 in the act of sale was fictitious, but alleged the true consideration to have been $900, to be paid as follows: $600 to V. W. Boagni (who had taken the note for that amount executed as a credit portion of the purchase price),

and $300 to the minor heirs of plaintiff. The $600 note held by Boagni is still unpaid, and there is nothing in the record to show that plaintiff was indebted to her minor children in any amount whatever. There was therefore no portion of the alleged purchase price paid by the defendant for the property which he claims to have bought from the plaintiff.

[2] Defendant filed a plea of estoppel, based on the allegation that plaintiff had leased the premises from him, and that she could not be heard to deny the title of her lessor.

In this court defendant appears to rely entirely upon the plea of estoppel filed by him; based upon the ratification said to have been made by Hermina Gallot in making a valid lease with him for the premises to which he holds the paper title, and the payment of the rent by her thereunder.

A lease, to have the effect of ratifying a voidable act of sale, must be a valid lease. In this case, the widow Gallot at no time recognized the defendant as being the owner of her property. When he announced to her, some months after the alleged sale, that he was the owner of the property, she denied the statement, and said that she had not sold the property to him. Defendant admits in his testimony that:

When he said to the deceased plaintiff, "I want to see what you are going to do about renting the place," (in the year following the act of sale), "she kinder looked surprised, she always claimed she did not want her children to know about this, and I told her, 'The place owes the children for your debt $300.' I said to her: 'I have got three bargains to offer you. I will give you 20 arpents with the house as the interest for the $300.' I thought there was something ought to come to the old woman; or, I would rent her the 50 arpents for $75 money rent; or, I would rent her what she could work for one-third; and she advised with Mr. Derbonne, and he told her that she had better take it for the .third, and she did that."

Mr. Derbonne, referred to in the testimony of McCoy, was a friend of the latter. He testified that he went with Mr. McCoy to see the widow Gallot on the request of McCoy, who said "he was going to rent the place to the old lady."

Mr. Derbonne further testified:

"When Dump came and spoke to her about renting her the place, it appeared to her, as if she had no idea she had sold the place. Dump told her, however, he said: 'The place is mine, and I have paid you for it, and I came to rent it to you if you want.' He says: 'I have three bargains to propose to you. I will rent you the 50 arpents, because the 25 arpents which adjoin me are the poorest land, I need it.' He said: 'If you want, I will give you 20 or 25 arpents as long as you live with the house on it.' I don't remember whether it was 20 or 25, but one or the other. 'Or I will rent to you for the third of the crop. I will rent to you for money the 50 arpents,' the best I remember for $75. She asked me what was the best for her to do. I asked Dump, 'you say you will give her 20 or 25 arpents with the house until her death?' and he said, 'Yes.' I asked him, I said, 'Dump, you will give her that before a notary in writing so that nobody could worry her or put her out?' and he said, 'No, I can't do that.' I told her, 'well it is no use taking that, for Dump might die to-morrow and they might put you out.' I advised her then that the best thing that she could do would be to rent the place on shares, because if she made any crop she could get some and Dump some, and if she made none neither would get any, and she consented to that. * * * She said she didn't know she had sold her place; she had gotten no money for her place."

This is all the evidence on the making of the alleged lease, and in our opinion it is insufficient. Plaintiff contended at the time that she was the owner of the property, and had not sold it to McCoy; and there is no evidence that she acknowledged McCoy as the owner thereof at any time. Defendant says that she consented to the lease on the terms that she was to have two-thirds of the crop and he was to have one-third. The witness Derbonne also says, "and she consented to that," referring to the working of the place on shares, and the giving of the one-third of the crop to McCoy. But he does not undertake to say how or in what manner she consented, and the whole matter is left very much in doubt so far as the testimony of this witness is concerned.

There was neither sale to McCoy, nor lease by the widow Gallot of the place from McCoy. The deceased did not divide the crop with the defendant, in payment of rent, as testified to by him. Mr. Bellard, witness for the plaintiff, testified on that point that:

"In 1911, Dump made no claim on her for rent, the same year that the act was passed. She made her crop and gave me (who had been advancing money on the crop) what she could on my account. Dump didn't make any claim for any part of the crop. In 1912, when the fall came around, he went to the place with his wagon and men and he divided the crop, and he took what portion he claimed and went off with it to his house. Some time after that he came to her house in a wagon and stated that he came to get a bale of cotton. She stated she had no cotton for him; that she owed me her crop. He told her, 'Well, I will go and see Jim.' He came to my house and unhitched the horses from the wagon. He came on a horseback. He bought a box of axle grease from me, and went back and told her that I said take a wagon load of cotton. He took a wagon load of cotton. The next morning about 1 o'clock he left and brought the cotton to Opelousas. She wanted to get her bale of cotton, but she didn't get it. The next year he didn't say anything to her."

The evidence is that the defendant took corn and cotton belonging to the plaintiff by force and subterfuge. She knew that she owed interest on the note which was held by Mr. Boagni, and she doubtless considered that her produce had been taken by McCoy for the purpose of paying interest on the note which was held by Boagni. There was no ratification of the alleged sale, either by the making of a lease, or the payment of rent under the lease.

[1] "Engagements made through error, violence, fraud or menace, are not absolutely null, but are voidable by the parties, who have contracted under the influence of such error, fraud, violence or menace, or by the representatives of such parties." C. C. 1881.

The evidence in this case is conclusive that fraud was practiced by the defendant upon the plaintiff, who was an ignorant, feeble, and old colored woman, who could neither read nor write, and who had appealed to him for the purpose of raising some money on her property to pay an existing mortgage note bearing upon that property. Instead of borrowing money thereon, defendant took title to the property in his own name; while plaintiff, in her ignorance and dependence on him, thought that the act which she was signing, or rather putting her mark to, was an act of mortgage or security of some kind. After getting the property into his name, defendant issued a mortgage note thereon for $600, and took up the existing mortgage note which was against the property while it stood in her name. He admits, and the notary testifies, that no money consideration was passed, although the stipulated price was for $1,500. The only money transaction that was had was the borrowing, by defendant, on a mortgage note issued by him and which bore upon the property for the sum of $600, with which he paid an existing mortgage debt of the plaintiff. That was the sole consideration for the alleged sale. Defendant says, in his testimony, that he assumed a debt due by plaintiff to her children, amounting to $300. But there is no evidence whatever of any debt being owed by the plaintiff to her children, and defendant admits that he never paid any such money or any portion thereof.

There is evidence in the record going to show that the 75 arpents belonging to the plaintiff were worth from $20 to $25 per arpent; and, as the only amount which can be said to have been paid was $600, the sale was void because of lesion, as alleged by plaintiff.

The witness Bellard says, with reference to the sale by plaintiff, that defendant said to him:

"He had fixed her, and well fixed her." "He said that he wanted the place. and that he had a whole lot of children to support, and that the old woman would lose her place anyhow, and he might as well beat her as any one else." "He said he had fixed her, and well fixed her; she couldn't kick any more."

This testimony was not denied by the defendant, when he subsequently took the stand as a witness in his own behalf. The act of

sale complained of was fraudulently made, and plaintiffs are entitled to have it set aside.

It appears from the evidence that the defendant paid the taxes on the property involved for the years it stood in his name; that he paid cash to different parties for plaintiff; that he took from the place certain portions of the crops for two years to which he was not entitled. But, as the value of the crop is not definitely stated, and as the amount paid for taxes is uncertain, the case will be remanded for the purpose of arriving at the amount due by the one party to the other.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed; and it is now ordered, adjudged, and decreed that there be judgment in favor of plaintiffs, the heirs of Hermina Gallot, and against the defendant, Allen McCoy, declaring the act of sale from Hermina Gallot, widow of Isadore Frette, to Allen McCoy, before J. Raoul Pavy, notary public, of date January 7, 1911, to be null and void, and that the registry thereof be canceled from the records of the parish; and that this case be remanded for the purpose of settling the accounts between the late Hermina Gallot and Allen McCoy as indicated in this opinion. The costs of this court and of the district court to this date are to be paid by the defendant.